## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| DAVID BUI,<br>Derivatively and on Behalf of<br>COOPER TIRE & RUBBER COMPANY,<br><br>     Plaintiff,<br><br>  vs.<br><br>ROY V. ARMES, BRADLEY HUGHES,<br>THOMAS P. CAPO, STEVEN M. CHAPMAN,<br>JOHN J. HOLLAND, JOHN F. MEIER,<br>CYNTHIA A. NIEKAMP, JOHN H. SHUEY,<br>RICHARD L. WAMBOLD, ROBERT. D.<br>WELDING<br><br>    Defendants,<br><br>  and<br><br>COOPER TIRE & RUBBER COMPANY,<br><br>    Nominal Defendant. | CASE NO: _____<br><br>**JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by and through his undersigned attorneys, brings this Verified Shareholder Derivative Complaint ("Complaint") in the name of and on behalf of nominal Defendant Cooper Tire & Rubber Company ("Cooper" or the "Company") against certain directors and officers of Cooper named herein. Plaintiff brings his claims based on personal knowledge as to his own acts, and on information and belief as to all other allegations, based on an investigation by counsel, including: (a) review and analysis of public filings made by Cooper and other persons with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications caused to be disseminated by certain of the Defendants and other persons; (c) review of news articles, shareholder communications, and postings on Cooper's websites concerning the Company's public statements; and (d) review of other publicly available

1

information concerning Cooper and other persons.

## SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by a Cooper shareholder on behalf of the Company against certain of its officers and directors seeking remedy for the Defendants' breaches of fiduciary duties and other applicable laws, which have caused substantial monetary losses to Cooper and other damages, including damages to its reputation and goodwill.  Among other things, defendants are responsible for Cooper's issuance of a series of materially false and misleading statements concerning the Company's business operations and financial condition. On Cooper's behalf, this action seeks damages and corporate governance reforms.

2.      On June 12, 2013, Cooper and Apollo Tyres Ltd. ("Apollo") announced a definitive merger agreement under which a wholly-owned subsidiary of Apollo would acquire Cooper in an all-cash transaction valued at approximately $2.5 billion, which included a $35.00 per share payment to Cooper stockholders (the "Proposed Acquisition").

3.      In conduct which a former Cooper executive described as a classic example of "corporate greed," Cooper's executive officer Defendants engaged in chicanery and obfuscation in order to consummate the transaction with Apollo, the completion of which would leave them with additional millions of dollars of compensation, while still allowing them to continue their lucrative and prestigious positions as Cooper executives.

4.      "Chairman" Che Hongzhi is Cooper's joint venture partner in a Chinese manufacturing facility known as the Cooper Chengshan Tire Company ("CCT").  The CCT facility is crucially important to Cooper's success, contains 40% of its workforce, and provides roughly 25% of its revenue.

5.      Chairman Che was fiercely opposed to Cooper's merger with Apollo, and

vehemently expressed his opposition to Cooper representatives, including Defendant Armes.

6.     The Individual Defendants did not disclose the vehemence of Chairman Che's opposition.   Rather, the press release announcing the merger touted the company's strong presence in China, stating that "Cooper is one of the most respected names in the tire industry, with an extensive distribution network and manufacturing infrastructure, and a particularly robust presence in North America and China."

7.     Further, Cooper's merger agreement with Apollo, filed as an exhibit to a Form 8-K with the SEC, noted that "the Company (Cooper) or one of its Subsidiaries has exclusive possession of each Owned Real Property and Leased Real Property," and that Cooper "maintained effective internal controls over its financial reporting, that it had maintained accurate and reasonably detailed records concerning the transactions and dispositions of its assets, recorded transactions as necessary in order to permit preparation of financial statements in accordance with GAAP, and provided reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on its financial statements." As events would demonstrate, Cooper's control over the CCT plant was illusory at best.

8.     The announcement of the merger sent the Company's stock skyward from $24.56 to close at $34.66 on June 12, 2013.

9.     On June 21, 2013, some 5,000 CCT workers, representing almost the entirety of Cooper's CCT workforce, went on strike.   They returned to work shortly thereafter, but stopped manufacturing Cooper-branded tires.   Cooper's managers were barred from entering the plant, and the Company had no access to Cooper's CCT books and records, leaving the Company unable to prepare its financials.   Without the Cooper financials, Apollo could not get bank

financing for the transaction.

10.     Even when presented with this dire situation, the Individual Defendants still misled shareholders concerning the extent to which problems with CCT would cause difficulties surrounding the Proposed Acquisition.  Cooper's Proxy Statement, the contents of which are the responsibility of the Company's Board of Directors (the "Board"), falsely stated that "[n]either the strike nor the plant slowdown are expected to have an effect on the consummation of the merger."

11.     On August 1, 2013, three weeks after the merger announcement, the United Steelworkers, Local Union 725L and 207L ("USW") filed a grievance challenging the merger as violating the terms of Cooper's Memoranda of Agreement with its plant employees in Texarkana, Arkansas and Findlay, Ohio.  On September 13, 2013, an arbitrator issued a decision barring the company from "selling or transferring the Texarkana and Findlay plants pursuant to the Agreement and Plan of merger unless and until the Union has entered into agreements with the buyer, Apollo Tyres B.V., prior to the closing recognizing the Union as the bargaining agent."

12.     This turn of events stood in stark contrast to what the Individual Defendants told Apollo.  Throughout the pre-merger discussions, Cooper executives had informed Apollo that they were confident in being able to settle any disagreement with the USW.  In fact, during the merger discussions no settlement value relating to the USW contracts was factored in the Proposed Acquisition $35 per share price.

13.     After lengthy discussions with USW, Apollo advised Cooper that for Apollo to settle with the USW, it would cost $150 million.  Apollo requested that Cooper lower the per share offer price by $2.50 per share as a result.

14.     On October 4, 2013, in a case captioned *Cooper Tire Rubber Company v. Apollo (Mauritius) Holdings Pvt. Ltd., et al.*, C.A. No. 8980-VCG (Del. Ch. 2013) Cooper sued Apollo in Delaware Chancery Court, alleging that Apollo had breached the merger agreement by not using its best efforts to close the transaction and was experiencing buyer's remorse.

15.     The Delaware Chancery Court ruled against Cooper, holding that Apollo had not breached the terms of the merger agreement.  Tellingly, the Delaware Chancery Court wrote:

> Cooper seeks an order compelling specific performance by the morning of the business day next following closing arguments: November 12, 2013.  Specific performance by such a date, according to Cooper, would relieve it of the obligation to disclose third–quarter financials to Apollo and its lenders, as would otherwise be required by financing agreements in support of the merger no later than November 14, 2013.  Cooper is unlikely to be able to provide those financials due to the physical seizure of a Cooper subsidiary in China by a minority partner in that venture.

*Cooper Tire & Rubber Co. v. Apollo (Mauritius) Holdings Pvt. Ltd.*, CV 8980-VCG, 2013 WL 5977140 (Del. Ch. Nov. 9, 2013) *appeal dismissed as improvidently allowed*, 624, 2013 WL 6662505 (Del. Dec. 16, 2013).

16.     By November 8, 2013, Cooper's stock price had collapsed to $23.82 per share.

17.     Further exacerbating its difficulties, on November 12, 2013 Cooper filed a Notification of Late Filing with the SEC, disclosing that it would be unable to file its Form 10-Q for the quarter ended September 30, 2013 because it still did not have access to the business records kept by CCT.

18.     On December 16, 2013, the Delaware Supreme Court dismissed Cooper's appeal of the Delaware Chancery Court's ruling, holding that the appeal had been improvidently allowed.  On December 30, 2013, the merger was called off.  Apollo continues to seek damages from Cooper.

19.     As Executives and Directors of Cooper, the Individual Defendants knew or should

have known of the precarious state of Cooper's relations with its Chinese subsidiary, and the difficulties incumbent upon the resolution of any disagreements with USW, yet deliberately cozened both Apollo and the investing public into believing that the merger would be consummated.

## JURISDICTION AND VENUE

20.     This court has jurisdiction over this action in that Cooper's primary place of business and corporate headquarters is located at 701 Lima Avenue, Findlay, Ohio 45840.

21.     Further, this Court has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. §1332 in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims so related to claims in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

22.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who as sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this District court permissible under traditional notions of fair play and substantial justice.

24.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Cooper maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the

transactions and wrongs complained of herein occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES AND OTHER PERSONS

### A. Plaintiff

25.     Plaintiff David Bui is, and at all times relevant herein has been, an owner and holder of Cooper common stock.  He is a citizen of California.

### B. Nominal Defendant

26.     Nominal Defendant Cooper Tire is a corporation organized and existing under the laws of Delaware with its principal place of business located at 701 Lima Avenue, Findlay, Ohio 45840.

### C. Defendants

27.     Defendant Roy V. Armes ("Armes") has been Cooper's President and Chief Executive Officer since January 2007, and has served as Chairman of the Board since December 2007.  Because of Armes's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known of the wrongful conduct and adverse, non-public information about the business of Cooper, including its finances, markets, and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. Cooper participated in the wrongful conduct and issuance of improper statements, including the preparation of improper statements to the press, security analysts, and Cooper shareholders.  Armes received in excess of $6.8 million in salary and other compensation from

Cooper in 2012.  Armes is a citizen of Ohio.

28.     Defendant Bradley E. Hughes ("Hughes") has been Cooper's Vice President and Chief Financial Officer since November, 2009.  Because of Hughes's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known of the wrongful conduct and adverse, non-public information about the business of Cooper, including its finances, markets, and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. Hughes participated in the wrongful conduct and issuance of improper statements, including the preparation of improper statements to the press, security analysts, and Cooper shareholders.  Hughes received nearly $1.8 million in salary and other compensation from Cooper in 2012.  Hughes is a citizen of Ohio.

29.     Defendant Thomas P. Capo ("Capo") has been a Cooper Director since 2007. Capo is a member of Cooper's Audit Committee.  Because of Capo's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known of the wrongful conduct and adverse, non-public information about the business of Cooper, including its finances, markets, and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. Capo participated in the wrongful conduct and issuance of improper statements, including the preparation of improper statements to the press, security analysts, and Cooper shareholders.   Capo received approximately $180,000 in fees and other compensation from Cooper in 2012.  Capo is a citizen

of Michigan.

30.     Defendant Stephen M. Chapman ("Chapman") has been a Cooper Director since 2006.  Chapman is a member of Cooper's Audit Committee and Cooper's Nominating and Governance Committee.  Because of Chapman's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known of the wrongful conduct and adverse, non-public information about the business of Cooper, including its finances, markets, and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.   Chapman received approximately $180,000 in fees and other compensation from Cooper in 2012.  Chapman is a citizen of Indiana.

31.     Defendant John J. Holland ("Holland") has been a Cooper Director since 2003.  Holland is Chairman of Cooper's Nominating and Governance Committee and Cooper's Compensation Committee.  Because of Holland's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known of the wrongful conduct and adverse, non-public information about the business of Cooper, including its finances, markets, and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  Holland received approximately $190,000 in fees and other compensation from Cooper in 2012.  Holland is a citizen of Kansas.

32.     Defendant John F. Meier ("Meier") has been a Cooper Director since 1997.  Meier is a member of Cooper's Nominating and Governance Committee and Cooper's

Compensation Committee. Because of Meier's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known of the wrongful conduct and adverse, non-public information about the business of Cooper, including its finances, markets, and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. Meier received approximately $195,000 in fees and other compensation from Cooper in 2012. Meier is a citizen of Ohio.

33.    Defendant Cynthia A. Niekamp ("Niekamp") has been a Cooper Director since 2011. Niekamp is a member of Cooper's Audit Committee. Because of Niekamp's positions, she knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known of the wrongful conduct and adverse, non-public information about the business of Cooper, including its finances, markets, and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. Niekamp participated in the wrongful conduct and issuance of improper statements, including the preparation of improper statements to the press, security analysts, and Cooper shareholders. Niekamp received approximately $180,000 in fees and other compensation from Cooper in 2012. Niekamp is a citizen of Michigan.

34.    Defendant John H. Shuey ("Shuey") has been a Cooper Director since 1996. Shuey is the Chairman of Cooper's Audit Committee and a member of Cooper's Nominating and Governance Committee. Because of Shuey's positions, he knew, consciously disregarded, was

reckless and grossly negligent in not knowing, or should have known of the wrongful conduct and adverse, non-public information about the business of Cooper, including its finances, markets, and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. Shuey participated in the wrongful conduct and issuance of improper statements, including the preparation of improper statements to the press, security analysts, and Cooper shareholders.  Shuey received approximately $195,000 in fees and other compensation from Cooper in 2012.  Shuey is a citizen of Florida.

35.     Defendant Richard L. Wambold ("Wambold") has been a Cooper Director since 2003.   Wambold is the Chairman of Cooper's Compensation Committee.   Because of Wambold's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known of the wrongful conduct and adverse, non-public information about the business of Cooper, including its finances, markets, and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. Wambold participated in the wrongful conduct and issuance of improper statements, including the preparation of improper statements to the press, security analysts, and Cooper shareholders.  Wambold received approximately $190,000 in fees and other compensation from Cooper in 2012.  Wambold is a citizen of Texas

36.     Defendant Robert D. Welding ("Welding") has been a Cooper Director since 2007.  Welding is a member of Cooper's Compensation Committee.  Because of Welding's

11

positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known of the wrongful conduct and adverse, non-public information about the business of Cooper, including its finances, markets, and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. Welding participated in the wrongful conduct and issuance of improper statements, including the preparation of improper statements to the press, security analysts, and Cooper shareholders. Welding received approximately $180,000 in fees and other compensation from Cooper in 2012. Welding is a citizen of Colorado.

## GENERAL FIDUCIARY DUTIES OF THE DEFENDANTS

37.    The Individual Defendants have stringent fiduciary obligations to Cooper and its shareholders.

38.    By reason of their positions as Officers and/or Directors, and Fiduciaries of Cooper, the Defendants owed Cooper and its shareholders fiduciary obligations of loyalty, good faith, due care, disclosure and candor and were and are required to use their utmost ability to control and manage Cooper in a fair, just, honest, and equitable manner. The Defendants were and are required to act in furtherance of the best interest of Cooper, and its shareholders, so as to benefit all shareholders equally and not in furtherance of their personal interest or benefits.

39.    Each Director and Officer of Cooper owed and owes to Cooper and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets and to uphold the highest obligations of fair dealing. In addition, as officers and/or directors of a

publicly held company, the Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial forecasts and predictions.

40.     The Defendants, because of their positions of control and authority as directors and/or officers of Cooper were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of various public statements issued by Cooper.  Because of their advisory, executive, managerial, and directorial positions with Cooper, each of the Defendants had access to adverse, non-public, material information about the financial condition and operations of Cooper.

41.     At all times relevant hereto, each of the Defendants was the agent of the other Defendants and of Cooper, and was at all times acting within the course and scope of such agency.

42.     To discharge their duties, the officers and directors of Cooper were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the operational affairs of the Company.  By virtue of such duties, the officers and directors of Cooper were required to, among other things:

    a.  Refrain from acting upon material, inside, corporate information to benefit themselves;

    b.  Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

    c.  Properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making

accurate statements about the Company's financial prospects, ensuring
that the Company maintained an adequate system of financial controls
such that the Company's financial reporting would be true and accurate at
all times;

d.  Ensure that the Company's revenue projections were based on appropriate
support and documentation, and were routinely checked for accuracy;

e.  Ensure that the Company was operated in a diligent, honest and prudent
manner; and

f.  Ensure that no inaccurate financial information about the Company was
released to the public that would tend to inflate artificially Cooper's stock
and that would thus cause corresponding or greater harm to the
Company's value when the truth was revealed.

43.    Each of the Defendants, by virtue of their position as a Director and/or Officer of
Cooper, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith,
due care, disclosure and  candor in the management and administration of the affairs of the
Company.   The conduct of the Defendants complained of herein involves a knowing and
culpable violation of their obligations as Directors and Officers of Cooper, the absence of good
faith on their part, and a reckless disregard for their duties to the Company and its shareholders.
The Defendants were aware, or should have been aware, that those violations, absences of good
faith, and the reckless disregard of duties posed a risk of serious injury to the Company.

44.    Because of their positions with the Company, and their access to material non-
public information available to them, Cooper, through the Defendants, knew that the adverse
facts specified herein had not been disclosed to and were being concealed from the public, and

14

that the positive representations being made relative to the Company's prospects were materially false and misleading when made. As a result of the Defendants' illegal actions and course of conduct, the Company is now subject to a shareholder lawsuit alleging violations of federal law. Further, the Company remains exposed to significant potential damages to Apollo in the aforementioned Delaware litigation, as well as the costs to defend itself in the Apollo action. As a result, Cooper has expended, and will continue to expend, significant sums of money.

## SPECIFIC FIDUCIARY DUTIES OF THE DEFENDANTS

### Duties of the Audit Committee

45.     Defendants Capo, Chapman, Niekamp, and Shuey are members of the Audit Committee.

46.     According to its Charter, the primary purpose of the Audit Committee is:

"to (a) assist the Board in fulfilling the Board's oversight responsibilities with respect to (i) the integrity of the Company's financial statements, (ii) the effectiveness of the Company's internal control over financial reporting, (iii) the Company's compliance with legal and regulatory requirements, (iv) the independent auditors' qualifications and independence, and (v) the performance of the independent auditors and the Company's internal audit function; and (b) prepare the Committee's report to be included, pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"), in the Company's annual proxy statement (the "Audit Committee Report")."

47.     The Audit Committee's Charter states, in pertinent part, that the Committee has, among other responsibilities, the responsibilities to:

•     Review and Discuss Financial Statements and Disclosures: The Committee shall review and discuss with appropriate officers of the Company and the independent auditors the annual audited and quarterly financial statements of the Company, including (a) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and (b) the disclosures regarding internal controls and other matters required to be reported to the Committee under applicable legal, regulatory and NYSE requirements. The Committee will make a recommendation to the Board whether or not the financial statements be included in the Company's Form 10-K.

- <u>Review and Discuss Earnings Press Releases</u>: The Committee is to review and discuss earnings and other financial press releases (including any use of "pro forma" or "adjusted" non-GAAP information).

- <u>Review and Discuss the Systems of Internal Accounting Controls</u>: The Committee is to review and discuss with the independent auditors, the senior internal auditing executive, the General Counsel and, if and to the extent deemed appropriate by the Chairman of the Committee, members of their respective staffs the adequacy of the Company's internal accounting controls, the Company's financial, auditing and accounting organizations and personnel, and the Company's policies and compliance procedures with respect to business practices which shall include (a) the disclosures regarding internal controls and matters required by Sections 302 and 404 of the Sarbanes-Oxley Act of 2002 and any rules promulgated thereunder by the SEC, and (b) a review with the independent auditors of their opinion on the effectiveness of management's assessment of internal controls over financial reporting and the independent auditor's analysis of matters requiring modification to management's certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

- The Committee shall discuss with management and the internal auditors management's process for assessing the effectiveness of internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act, including any material weaknesses or significant deficiencies identified.

- The Committee shall review management's report on its assessment of the effectiveness of internal control over financial reporting as of the end of each fiscal year and the independent auditors' report on the effectiveness of internal control over financial reporting.

- The Committee shall discuss with the independent auditors the characterization of deficiencies in internal control over financial reporting. The Committee shall also discuss with management its remediation plan to address internal control deficiencies, and review any disclosures describing any identified material weaknesses and management's remediation plans.

- The Committee shall discuss with management its process for performing its required quarterly certifications under Section 302 of the Sarbanes-Oxley Act, including the evaluation of the effectiveness of disclosure controls by the Chief Executive Officer and Chief Financial Officer.

- The Committee shall review with senior management the Company's anti-fraud programs and controls.

- The Committee shall discuss with management, the internal auditors, and the independent auditors any (a) changes in internal control over financial

reporting that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting that are required to be disclosed and (b) any other changes in internal control over financial reporting that were considered for disclosure in the Company's periodic filings with the SEC.

• <u>Discuss Risk Management Policies</u>: The Committee is to discuss guidelines and policies with respect to risk assessment and risk management to assess and manage the Company's exposure to risk. The Committee should discuss the Company's major financial risk exposures and the steps management has taken to monitor and control these exposures.

• <u>Obtain Reports Regarding Conformity with Legal Requirements and the Company's Code of Business Conduct and Ethics</u>: The Committee is to periodically obtain reports from management, the Company's senior internal auditing executive and the independent auditor that the Company and its subsidiary/foreign affiliated entities are in conformity with applicable legal requirements and the Company's Code of Business Conduct and Ethics. The Committee should advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Business Conduct and Ethics.

• <u>Establish Procedures for Complaints Regarding Financial Statements or Accounting Policies</u>: The Committee is to establish procedures for (a) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters as required by Section 301 of the Sarbanes-Oxley Act of 2002 and the rules and listing requirements promulgated thereunder by the SEC and the NYSE; and (c) the confidential receipt, retention and consideration of any report of evidence of a material violation (within the meaning of Rule 205 of the Rules of Practice of the SEC).

• <u>Discuss Legal Affairs</u>: The Committee will periodically discuss with the Company's General Counsel, management and the independent auditors the Company's legal affairs, including (a) any actions taken by, and correspondence with, any governmental authorities, (b) any governmental matters that may have a material impact on the Company, and (c) any other significant outstanding legal matters involving the Company or any of its subsidiaries that may have a material impact on the financial statements or the Company's compliance policies.

• <u>Review Conflicts of Interest and Related Party Transactions</u>: The Committee is to obtain and review reports and disclosures of material conflicts of interests and insider and /or related-party transactions.

• <u>Review and Discuss Other Matters</u>: The Committee should review and

discuss such other matters that relate to the accounting, auditing and financial reporting practices and procedures of the Company as the Committee may, in its own discretion, deem desirable in connection with the review functions described above.   Additionally, the Committee will advise and consult with management and the Board from time to time in its discretion or as requested by management or the Board on other financial issues affecting the Company including matters such as capital structure, dividend policy, credit ratings and pension obligations

- Maintain Flexibility: The Committee, in carrying out its responsibilities, policies and procedures should remain flexible, in order to best react to changing conditions and circumstances.   The Committee should take appropriate actions to set the overall corporate "tone" for quality financial reporting, sound business risk practices, and ethical behavior.

### Duties of the Nominating and Governance Committee

48.     Defendants Chapman, Holland, Meier, and Shuey are members of the Nominating and Governance Committee.

49.     According to its Charter, the primary purposes of the Nominating and Governance Committee "are to (a) identify and recommend candidates for membership on the Board, consistent with criteria approved by the Board; (b) develop and recommend to the Board corporate governance guidelines applicable to the Company; and (c) oversee the evaluation of the Board and management."

50.     The Nominating and Governance Committee's Charter states, in pertinent part, that the Committee has, among other responsibilities, the responsibilities to:

- Monitor compliance with the Board's governance guidelines, periodically review the guidelines, and recommend changes to the guidelines as necessary or appropriate.

- Conduct an annual assessment of the performance of the Board, using such criteria as it determines are appropriate, and report its assessment to the Board.

- Perform an annual evaluation of the Committee's performance and report the results of the evaluation to the Board.

- Establish objective criteria by which the performance of the Chief

18

Executive Officer can be evaluated by the Compensation Committee and other independent Directors.

- Maintain oversight of the Risk Management Metrics Process.

- Regularly report the Committee's activities and any recommendations to the Board in such manner and at such times as the Committee or the Board deems appropriate

### Duties Contained in Cooper's Code of Business Conduct and Ethics

51.     Cooper's Code of Business Conduct and Ethics is intended to deter wrongdoing and to promote the conduct of all Company business in accordance with high standards of integrity and in compliance with all applicable laws and regulations. The Code of Business Conduct and Ethics requires that each member of Cooper's management, its executives and its directors, has the following duties, among others:

- Each employee shall maintain a high level of integrity in his or her business conduct and shall encourage other employees to do likewise. Each employee shall fully obey the law and shall avoid efforts to evade the law by devious means or questionable interpretations.

- While there are a multitude of laws and regulations applicable to all phases of the Company's business, all personnel shall be reasonably familiar with the rules applicable to their areas of responsibility. If any question arises concerning the applicability of a law or regulation or this policy to a contemplated action, the Company's Law Department must be consulted before taking such action.

- Cooper Tire & Rubber Company files reports and other documents with the SEC and the New York Stock Exchange and issues press releases and other documents concerning financial and any other information about our business. The Company strives to make full, fair, accurate, timely and understandable disclosure in our reports and in our press releases and other public communications.

- The Company maintains its books, records, accounts and financial statements in reasonable detail. Federal law, contained in the Foreign Corrupt Practices Act, requires the Company to assure its books and records accurately reflect the true nature of the transactions represented. The name of the law is very misleading. As far as it relates to books and records, it is not limited to foreign operations nor corrupt practices. Therefore, in all of our operations, it is against

Company policy, and possibly illegal, for any employee to cause our books and records to be inaccurate in any way. Examples would include making the records appear as though payments were to be made to one person when, in fact, they were to be passed on to another; submitting expense accounts which do not accurately reflect the true nature of the expense; the creation of an invoice or other document reflecting an inflated price or failing to disclose a discount and the creation of any other records which do not accurately reflect the true nature of the transaction.

- It is particularly important that no employee shall create, or participate in the creation of, any records which are intended to mislead anyone or to conceal anything which is improper.

- Further, the Foreign Corrupt Practices Act requires the Company to maintain internal accounting controls sufficient to provide reasonable assurance, among other things, that transactions are carried out in accordance with the Company's policies and access to the Company's assets is permitted only in accordance with management's authorization. No employee shall do anything to circumvent or avoid the Company's accounting control system. The integrity and completeness of our record keeping is required by various laws, including the Sarbanes Oxley Act of 2002.

- The Company policy is to observe the highest ethical standards in its business transactions - including those involving foreign countries. The Company shall do nothing in connection with any international transaction and take no action in any foreign country which would be illegal or improper in the United States or under the laws of such foreign country. All employees shall observe applicable foreign laws to which they or the Company may be subject. This includes foreign tax or exchange control laws or regulations. No action shall be taken which is intended to improperly circumvent the application of such laws....

**Conclusion**

The Company's good name and reputation depend, to a very large extent, upon your taking personal responsibility for maintaining and adhering to the policies and guidelines set forth in this Code.   Your business conduct on behalf of the Company must be guided by the policies and guidelines set forth in this Code. Our Code of Business Ethics & Standards of Conduct helps us recognize and deal with ethical issues and provides guidelines for reporting unethical conduct. Our Code of Business Ethics & Standards of Conduct also fosters a culture of honesty and accountability.

The Company takes violations of our Code of Business Ethics & Standards of Conduct very seriously.   The Company will take prompt and consistent action against violations, and violations may result in disciplinary action, including dismissal.

The responsibility for meeting our legal and ethical obligations cannot be fully defined or ensured by any set of written rules, however extensive they may be. Because no set of rules or guidelines can cover all of the Company's legal and ethical obligations, our confidence must rest ultimately, as it always has, upon the honesty, integrity and good sense of each of us.

Consistent with New York Stock Exchange listing requirements, this Code will be included on Cooper Tire & Rubber Company's website and will be made available upon request sent to the Cooper Tire & Rubber Company's Corporate Secretary.   Cooper Tire & Rubber Company's annual report on Form 10-K will state that this Code is available on the Cooper Tire & Rubber Company's website and will be made available upon request sent to Cooper Tire & Rubber Company's Corporate Secretary.

## DEFENDANTS BREACH THEIR FIDUCIARY DUTIES

52.    Defendants, by their fiduciary duties of care, good faith, candor and loyalty, owe to Cooper a duty to insure that the Company's public statements fairly represent the operations and business prospects of the Company.  To carry out these duties adequately, it is necessary for the Defendants to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements.

53.    By revenue, Cooper is the fourth largest tire manufacturer in the North America and the eleventh-largest tire manufacturer worldwide.  As part of its operations, Cooper has a substantial presence in China, including the CCT manufacturing facility.  Consisting of nearly 40% of Cooper's entire workforce, the CCT facility is crucially important to Cooper's overall business. Cooper owns 65% of CCT, with the remainder owned by Chairman Che's company, Chengshan.

54.    Cooper's Chinese operations drove Apollo's interest in Cooper.  As Apollo's Neeraj Kanwar testified in subsequent litigation, "China is very, very important for the transaction and still is very important for the transaction.  It is the fastest growing economy in the world."

55.    Chairman Che was fiercely opposed to Apollo's attempt to merge with Cooper.

Chairman Che offered to purchase Cooper himself for $38 per share or, in the alternative, demanded significant compensation in return for his approval of the deal.

56.   Following the announcement of the merger, CCT workers went on strike, shutting down the CCT facility for more than a month.  Cooper representatives were prevented by armed security forces from removing Cooper tire molds from the facility, and Cooper was unable to access the CCT financial records.  Even when production restarted at the CCT facility, the facility refused to produce Cooper branded tires.

57.   Simultaneously and in part related to the CCT shutdown, Cooper's financial prospects began to decline precipitously.  On July 21, 2013, Cooper advised Apollo that for 2013, Cooper projected $4.3 billion in revenue and $380 million in profit.

58.   On August 9, 2013, Cooper revised this projection downward to $3.9 billion in revenue and $363 million in operating profit.  One month later, on September 9, 2013, Cooper further revised its projections to $3.6 billion in revenues and $315 million in operating profit.

59.   These continual declines were hidden from Cooper shareholders.  Cooper's Proxy Statement, filed on August 30, 2013, presents two sets of figures representing Cooper's sales projections for 2013.  The first, which revised previously provided projections to include actual results from 2013's first quarter, projected net sales as $4.218 billion and EBITDA (a slightly more conservative figure than operating profit since it removes depreciation and amortization) at $538 million.  The second, which Cooper termed a "sensitivity case" projection and which hypothesized the effects of a cyclical downtown on Cooper finances, anticipated net sales of $4.188 billion in 2013and EBITDA of $521 million.

60.   Crucially, three weeks before Cooper issued the Proxy Statement; it had provided Apollo with projections showing $3.9 billion in revenue, even less than Cooper's pessimistic

sensitivity case projection. Critically, the Proxy Statement was never updated, even though by the time of the shareholder vote, internally, Cooper anticipated only $3.4 billion in revenue and $257 million in operating profit.

61.     Cooper's failing fiscal projections were mirrored by continued flailing in China. In a failed exercise of coercive force, Cooper cut off payments to CCT's raw materials provider. Cooper even explored the possibility of dispatching its own armed force to retake the CCT plant, a course of action avoided only because Cooper realized it was likely to result in a physical clash with CCT's forces.

62.     Cooper continued to downplay its China problems, advising shareholders in the proxy statement that "[n]either the strike nor the plant slowdown are expected to have an effect on the consummation of the merger." Based in part on this revelation in the Proxy Statement, on September 30, 2013, Cooper's shareholders voted overwhelmingly in favor of the Proposed Acquisition.

63.     Yet, Cooper executives knew that without access to the CCT books and records, Apollo would be unable to gain the financing necessary to close the transaction. In correspondence dated August 27, 2013, Apollo's managing director wrote to Defendant Armes regarding the CCT facility issues, stating, "[w]e and increasingly, our financing banks are growing more and more anxious regarding the issues, the lack of demonstrable progress and the impact this is having on your financial results and our ability to complete this transaction."

64.     Chairman Che's coup was not the only threat to the merger. USW workers at Cooper's Findlay and Texarkana plants filed a grievance pursuant to their union contract with Cooper, which gave USW workers a say in a change of management. Cooper hid its tumultuous relationship with the USW, including a recent lockout at the Findlay plant. According to

Apollo's CFO, "When we raised it (USW's say in the event of a change in management) with the Cooper management, they said that in their view it didn't apply at all and they were very confident that they would be able to settle with USW."

65.     During the grievance proceeding, the arbitrator agreed with USW and entered an order barring the merger from proceeding absent USW approval. Cooper advised Apollo prior to the tripartite negotiations that it estimated the cost of placating USW at $10 million.

66.     After receiving USW's ten demands during the negotiation's opening round on September 19, 2013, Apollo estimated compliance at $130 million to $140 million, and at a meeting on October 2, asked Cooper's executives to revise the per share price downward from $35 per share to $33.50 per share.

67.     Two days later, Cooper sued Apollo in the Delaware Chancery Court, alleging that Apollo had buyer's remorse, and had breached the merger agreement by failing to exercise its "reasonable best efforts" to close the transaction.  Although the merger was not scheduled to close until December 30, Cooper requested that the merger be immediately consummated.

68.     As the Delaware Court recognized,

> Cooper seeks an order compelling specific performance by the morning of the business day next following closing arguments: November 12, 2013.  Specific performance by such a date, according to Cooper, would relieve it of the obligation to disclose third–quarter financials to Apollo and its lenders, as would otherwise be required by financing agreements in support of the merger no later than November 14, 2013.  Cooper is unlikely to be able to provide those financials due to the physical seizure of a Cooper subsidiary in China by a minority partner in that venture.

*Cooper Tire & Rubber Co. v. Apollo (Mauritius) Holdings Pvt. Ltd.*, CV 8980-VCG, 2013 WL 5977140 (Del. Ch. Nov. 9, 2013) *appeal dismissed as improvidently allowed*, 624, 2013 WL 6662505 (Del. Dec. 16, 2013).

69.     In a bench ruling, the Delaware Court of Chancery found that Apollo did not

breach the merger agreement, and denied Cooper's request for an order forcing consummation.

70.     This negative news caused Cooper's common stock to plunge to $23.82 per share, from a high of $34.66 on June 12, 2013, after the merger's announcement.

71.     The Company's and Defendants' statements mentioned above were false and misleading because the Defendants knew, but did not disclose the material facts that: (a) Chairman Che, and not the Company, had control of the Company's CCT facility, and was highly dissatisfied with the merger, jeopardizing Cooper's Chinese production, and; (b) that the Company's agreement with the USW required USW approval of a proposed merger, and that USW approval would be prohibitively expensive.  These material facts known to the Defendants but not known to Cooper shareholders jeopardized the merger and were the primary cause of the merger not being consummated.

72.     As a result of the conduct alleged above, Cooper is subject to a class action complaint for violation of the securities laws, captioned *OFI Risk Arbitrages, et al., v. Cooper Tire & Rubber Company, et al.*, 1:14-cv-00068 (filed, January 17, 2014) and to litigation commenced by Apollo captioned *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Holdings Pvt. Ltd.*, CV 8980-VCG, 2013 WL 5977140 (Del. Ch. Nov. 9, 2013).

## DERIVATIVE ALLEGATIONS

73.     Plaintiff brings this action derivatively in the right of and for the benefit of Cooper to redress injuries suffered, and to be suffered, by Cooper as a direct result of the violations of state law, including breaches of fiduciary duty and abuse of control by Defendants.

74.     Cooper is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.  Plaintiff was a shareholder of Cooper at the time of the transgressions of which

he complains, and continues to be so.  Plaintiff will adequately and fairly represent the interests of Cooper and its shareholders in prosecuting and enforcing their rights.  Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

75.     The wrongful acts complained of herein subject, and will continue to subject, Cooper to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

76.     The wrongful acts complained of herein were unlawfully concealed from Cooper shareholders.

## DEMAND FUTILITY

77.     Demand upon the Cooper Board that they institute this action in the Company's name would be entirely futile, and is therefore excused.

78.     The Cooper Board is comprised of nine individuals, Defendants Armes, Capo, Chapman, Holland, Meier, Niekamp, Shuey, Wambold, and Welding.

79.     Defendants Capo, Chapman and Niekamp, as the current members of the Audit Committee, Defendant Shuey as Chairman of the Audit Committee, and Defendant Armes, as CEO, President, and Chairman of the Board, were responsible for ensuring that the Company's disclosures, including disclosures relating to the merger and likelihood of its consummation had a strong basis in fact.  Thus, there is a significant doubt that these Director Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties.  As such, the Defendants Capo, Chapman, Niekamp, Shuey, and Armes are not capable of responding adequately to a demand.

80.     Defendants Chapman, Meier, and Shuey as the current members of the Nominating and Governance Committee, and Defendant Holland as Chairman of the Nominating

and Governance Committee, were responsible for overseeing the Board's conformance with the Company's governance guidelines, including guidelines such as the Company's Code of Business Conduct and Ethics. As stated above, the Company's disclosures, including disclosures related to the merger, the likelihood of its consummation, and the Company's control over its CCT facility had no strong basis in fact, could not, and did not comply with the Company's Code of Business Conduct and Ethics. Thus, there is a significant doubt that these Director Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duties. As such, Defendants Chapman, Meier, Shuey, and Holland are not capable of responding adequately to a demand.

81.     As noted above, Defendant Armes, both individually and in conjunction with Defendant Hughes, willfully and deliberately mislead Apollo about Cooper's control of its CCT facility and Cooper's ability to reach an acceptable agreement with the USW at Cooper's Findlay and Texarkana plants. This conduct has caused, and continues to cause substantial harm to Cooper, and Defendant Armes faces a substantial likelihood of liability for his breach of fiduciary duty. As such, Defendant Armes is not capable of responding adequately to a demand.

82.     Cooper executives engaged in deliberate obfuscation and chicanery in a misguided attempt to complete the transaction at the $35 per-share price. Defendant Armes individually would have received about $7 million in appreciated value of his personal stock and restricted and performance-based shares and change-in control provisions would have potentially earned him an additional $14 million upon consummation. Dick Stephens, the former president of Cooper's North American Tire Operations, described the conduct of Armes and his fellow executives as "corporate greed", and their mindset as "If I walk out of there with $10 million, $20 million, $30 million or more, and screw everybody else, or potentially screw everybody else,

27

I don't care."

83.     Throughout the lead-up to the proposed merger and subsequent to its announcement, management kept the Directors apprised of all pertinent facts and occurrences relating to the merger.   Thus, the entirety of the Board knew, or should have known, of the importance of both the opposition of Chairman Che and USW to the merger, and knew, or should have known, that such facts were material to the investing public in assessing the merger and the potential for its consummation.   Yet the Board did not disclose these material facts and were directly involved in the misconduct challenged in this action.   The Defendants abdicated their responsibility to oversee the Company's operations and instead directed and encouraged management, in the service of their own personal gain, to engage in illegal and/or improper conduct that rendered the Company's disclosures deceptively misleading.   The Defendants' misrepresentations lacked any legitimate business purpose and were not a product of a valid exercise of business judgment.   As such, demand is excused as futile.

84.     Each of the Director Defendants reviewed and approved the Proxy Statement, which contained false and misleading statements as described above.   Thus, there is a significant doubt that the Director Defendants are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duty.   As such demand is excused as futile.

85.     Demand on the nine member Board is thus futile; Defendants Armes, Capo, Chapman, Holland, Meier, Niekamp, Shuey, Wambold, and Welding all face a substantial likelihood of liability.   Demand is thus excused.

86.     Plaintiff has not made any demand on shareholders of Cooper because such demand would be futile.   As a widely-held public company, Cooper has millions of shares outstanding; identifying and making demands on the hundreds of thousands, if not millions, of

shareholders who own these shares would be impossible for Plaintiff, both as a matter of practical reality and in terms of financial cost.

## COUNT I
### Derivatively Against the Individual Defendants for Breach of Fiduciary Duty

87.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

88.    Each of these defendants owed and owes fiduciary obligations to the shareholders of Cooper. By reason of their fiduciary relationships, defendants owed and owe Cooper's shareholders the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

89.    These defendants, and each of them, violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

90.    Each of these defendants had actual or constructive knowledge that they caused the Company to incur significant risk by failing to  report adequately the Company's true financial projections, its lack of control of the CCT facility, the likelihood of an agreement with the USW plants in Findlay and Texarkana, and the likelihood of the consummation of the merger. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

91.    Defendants caused or allowed the Company to lack requisite internal controls, and, as a result, the Company is potentially liable for civil damages.

92.    Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving Cooper.

93.    As a result of the misconduct alleged herein, Cooper and its shareholders have been damaged and injured.

## COUNT II
## Against All Defendants for Waste of Corporate Assets

94.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

95.    As a result of the misconduct described above, including failing to properly consider the interests of the Company and its public shareholders, failing to conduct proper supervision, paying bonuses to certain of its executive officers, and incurring potentially tens of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions the Individual Defendants have caused Cooper to suffer damages in an amount in excess of the jurisdictional limits of this Court

96.    As a result of the waste of corporate assets, the Individual Defendants are liable to plaintiff and the shareholders.

97.    Plaintiff, on behalf of Cooper, has no adequate remedy at law.

## COUNT III
## Against All Defendants for Unjust Enrichment

98.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

99.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Cooper.

100.    Plaintiff, as a shareholder and representative of Cooper, seeks restitution from these defendants, and each of them, and seeks an order of this Court requiring defendants to disgorge all profits, benefits and other compensation obtained as a result of their wrongful conduct and fiduciary breaches.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows

a.      Against all of the Defendants and in favor of Cooper for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties and abuse of control.

b.      Directing Cooper to take all necessary actions to reform and improve its corporate governance and internal procedures so that the Company's disclosures of material events are accurately reported and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions and amendments to the By-Laws and Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote measures to guard against a repetition of the circumstances described herein, including measures to:

     i.      Strengthen the Board's supervision of accounting compliance by the Company, including the development of procedures for greater shareholder input into the policies and guidelines of the Board and Audit Committee;

     ii.      Replace the current members of the Audit Committee;

     iii.      Permit the Cooper shareholders to nominate at least two candidates to the Board and Audit Committee;

     iv.      Appropriately test and audit Cooper's regulatory compliance with SEC and accounting practices.

c.      Permanently separate the offices of President and Chief Executive Officer from that of Chairman of the Board.

d.      Awarding Plaintiff the costs and disbursements of the action, including reasonable

attorneys' fees, accountants' and experts' fees, costs, and expenses;

e.      And such other relief as this Court deems just and proper.

### **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

*/s/ Andrew S. Goldwasser, Esq.*
CIANO & GOLDWASSER, L.L.P.
Andrew S. Goldwasser (#0068397)
Phillip A. Ciano (#0066134)
101 Prospect Avenue, W.
1610 Midland Building
Cleveland, Ohio 44115
Telephone:  (216) 658-9900
Facsimile:  (216) 658-9920
E-mail: pac@c-g-law.com
        asg@c-g-law.com

MORGAN & MORGAN, P.C.
Peter Safirstein, *pro hac application to be filed*
Roger Sachar, *pro hac application to be filed*
28 W. 44th Street, Suite 2001
New York, NY 10036
Telephone: (212) 564-1637
psafirstein@morgansecuritieslaw.com
rsachar@morgansecuritieslaw.com

## VERIFICATION

I, David Bui, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I and am currently a shareholder of Cooper Tire & Rubber Company.

I make this Verification under penalty of perjury that the foregoing is true and correct.

_____
David Bui

SWORN TO AND SUBSCRIBED,
before me this _19_th day of February, 2014.
State of California, County of _Orange_

_____
Notary Public

KENNETH H. NAKAMOTO
Commission # 2006663
Notary Public - California
Orange County
My Comm. Expires Mar 3, 2017

_3-3-2017_
My Commission Expires